## Jarvis, Trustee, Appellant, v. Bell.

570

Argued March 20, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Edwin W. Smith,* of *Reed, Smith, Shaw & McClay,* with him *George D. Wick,* for appellant.—The burden of proof was on defendant: Woolston's App., 51 Pa. 452; McKown's Est., 198 Pa. 96; Shaver v. Mowry, 262 Pa. 381; Penna. Trust Co. v. Schenecker, 289 Pa. 277; American Trust Co. v. Kaufman, 287 Pa. 461.

The admissions of John A. Bell, Sr., after the date of the deed as to his indebtedness shown by the schedules of his liabilities in the bankruptcy case, were inadmissible: Boyer v. Weimer, 204 Pa. 295; Souder v. Schechterly, 91 Pa. 83.

Tax returns may be competent, relevant and material, as evidence of value, in many cases: West Chester, etc., Road Co. v. Chester Co., 182 Pa. 40; Mifflin Bridge Co. v. Juniata Co., 144 Pa. 365; Souder v. Schechterly, 91 Pa. 83.

The ruling of the court limiting testimony in rebuttal where defendant had the burden of proving solvency and consideration to contradiction of specific testimony of particular witnesses, was wrong: Lynch v. Light & Power Co., 268 Pa. 337; Bunnell v. Kintner, 27 Pa. Superior Ct. 605; Throckmorton v. Holt, 180 U. S. 552; Asay v. Hay, 89 Pa. 77.

*H. Fred Mercer,* for appellee, The Bank of Pittsburgh, N. A.—At the time of making the deed, John A. Bell, Sr., was solvent; the slump in the coal business came the following year.

The indebtedness shown by the schedules in bankruptcy filed two years after the deed, was already proven, and in refusing the schedules there was no error: Worrall v. Pyle, 132 Pa. 529; Fitzpatrick v. Traction Co., 206 Pa. 335; Bruggeman v. York, 254 Pa. 430.

Since the stock of the coal companies was not quoted and had no market value, the appraisal of the coal lands was proper to show their real value.

Having shown that the father invested only $200,000 in the oil properties, the contracts for their sale were properly admitted to show profit.

The capital stock reports were properly limited to a contradiction of the testimony of Mr. Bell, Sr.: Girard Trust Co. v. Phila., 248 Pa. 179.

Plaintiff, having shown Bell, Sr.'s, liabilities as a part of his case in chief, was not injured by the court's refusal to permit Bell, Sr.'s, liabilities to be proved in rebuttal; it would have been mere repetition: Knights of Pythias v. Leadbeter, 2 Pa. Superior Ct. 461; Schuck v. R. R., 283 Pa. 152; Shelter v. Cash Stores Co., 283 Pa.

307; Hoffman v. Coal Mining Co., 265 Pa. 476; Young v. Edwards, 72 Pa. 257.

*James S. Crawford,* of *Patterson, Crawford, Arensberg & Dunn,* for appellee, John A. Bell, Jr.—No admissible evidence as to Bell, Sr.'s, indebtedness, as shown by the bankruptcy schedules, was excluded.

Evidence was properly admitted to show the market value of the properties owned by the various coal companies in order to prove the actual value of the stock owned by Bell, Sr., therein.

The cases in which tax returns have been permitted to be used as evidence have all been cases in which the corporation itself was a party and the question at issue was the value of its corporate property.

In such cases, a tax return made by its officers is held to be competent evidence as an admission by the corporation against its interest: West Chester, etc., Road Co. v. County, 182 Pa. 40; Mifflin Bridge Co. v. County, 144 Pa. 365.

The exclusion of evidence in rebuttal, already offered in plaintiff's case in chief, was proper.

OPINION BY MR. JUSTICE WALLING, April 22, 1929:

In 1917, John A. Bell, Sr., (herein called Mr. Bell) then a prominent coal operator and banker of Allegheny County, purchased farms amounting to eleven hundred acres, from which the Bell Farm near Coraopolis was established. His son, John A. Bell, Jr. (herein called John), was at once put in possession and given management of the farm. Mr. Bell had expended for the farm, its improvement, equipment and other expenses connected therewith, over a million dollars, when, on October 6, 1923, he gave John a deed of the entire farm property, which was recorded within sixty days. The consideration recited in the deed is one dollar and other good and valuable considerations and there were no United States revenue stamps thereon. On August 7,

1925, Mr. Bell filed a voluntary petition in bankruptcy, was adjudged bankrupt and James N. Jarvis, who was appointed trustee of his estate, brought this suit in ejectment against John for the farm above mentioned, averring that the conveyance thereof to him was in fraud of Mr. Bell's creditors. Meantime large judgments had been entered against John on obligations he had given as surety for his father and, by agreement of the parties, made pending this suit, the farm with its equipment was sold for $200,000, the same to stand in place of the land. At the end of a protracted trial the jury found for the defendant and from judgment entered thereon plaintiff has appealed.

The assignments relate to alleged trial errors; a careful examination of each discloses no sufficient ground for reversal. The trial involved two main questions—(a) the solvency of Mr. Bell and (b) the adequacy of the consideration for the conveyance. Admittedly, if Mr. Bell was solvent in October, 1923, and would be so after the conveyance, he could deed the farm to his son regardless of the consideration. Under the state statute of May 21, 1921, P. L. 1045, section 2, "A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured"; while section 4 thereof is, "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." Under the Federal Bankruptcy Law, "A debtor is insolvent when the aggregate of his property shall not, at a fair valuation, be sufficient in amount to pay his debts": 3 R. C. L. page 275, section 98. The evidence on behalf of plaintiff tended to fix Mr. Bell's liabilities at the time of the conveyance, all told, at approximately eight million dollars and his assets at substantially less than that

amount. This was largely by the testimony of M. C. Conick, an expert accountant, from an examination of Mr. Bell's books, also those of the numerous corporations with which he was affiliated, his petition and the accompanying schedules in bankruptcy, etc. The schedules were not formally offered in evidence, but the witness considered them in giving his testimony and expressly so stated. The remark of the trial judge that declarations of Mr. Bell made after the transfer could not affect John's title, was sound as a general proposition and in any event did plaintiff no harm. As to the bankruptcy proceedings John was a third party against whom the schedules were not evidence. "Where a trustee in bankruptcy sues to recover moneys of a bankrupt said to be in the hands of a defendant, the notes of testimony of the bankrupt at the preliminary examination before the referee as to his assets and liabilities are inadmissible in evidence, the issue not being between the same parties": 7 C. J. 272. "In an action by a bankrupt's trustee to recover an alleged preference, the bankrupt's schedules filed by him are not admissible": Batchelder v. Home Nat. Bank, 105 N. E. (Mass.) 1052. Again, the schedules were in substance presented to the jury in Conick's testimony. A judgment will not be reversed because of the exclusion of evidence where substantially the same is subsequently admitted: Bruggeman v. York, 254 Pa. 430; Fitzpatrick v. Traction Co., 206 Pa. 335; Worrall v. Pyle, 132 Pa. 529; and see Hicks v. Harbison-Walker Co., 212 Pa. 437. This is especially so here as to transactions occurring subsequent to the date of the deed in question.

In 1923 Mr. Bell owned large blocks of stock in various coal companies, which were without market value but of great actual worth. To establish this the trial judge permitted the defendant to show by expert evidence the value of the coal lands and other property of these several coal companies. This ruling is supported by all the authorities. See opinion of Mr. Justice KEP-

HART, speaking for the court, in McWilliams v. Altemus, 288 Pa. 277, and cases cited; also Gorham v. Massillon Iron & Steel Co., 120 N. E. (Ills.) 467; Moffit v. Hereford, 34 S. W. (Mo.) 252; Watrous v. Bialy's Est., 192 N. W. (Mich.) 628, and other cases. The stockholders own the corporation and in the absence of market value the best evidence of the worth of the stock is the actual value of the corporate property. Mr. Bell's coal holdings as thus determined were some four and a half million dollars greater than shown by the book assets of the several corporations. The latter in the main represented the original cost and was not conclusive of actual present value. See West Chester, etc., Co. v. Chester Co., 182 Pa. 40. During the summer and fall of 1923 Mr. Bell arranged a merger of four coal companies, and to facilitate this employed two competent experts to appraise the value of the respective properties. He also personally owned nine thousand three hundred and sixty-six acres of coal which he transferred to the new company.

The bituminous coal business was then prosperous in Pennsylvania, but on April 1, 1924, the Jacksonville agreement was signed between the operators and miners, which so increased the cost of coal production in Pennsylvania that the operators here were unable to compete in the open market with coal mined elsewhere. To a large extent this caused the closing of the coal mines in Western Pennsylvania, and so crippled the industry as to cause a sharp decline in the value of coal lands, great financial loss to operators and suffering among miners. Mr. Bell's testimony estimated his net worth in October, 1923, at $12,000,000 and expert evidence for the defense tended to show it was then at least $7,000,000. Whatever it may have been, he was insolvent in August, 1925. Having offered evidence in chief as to Mr. Bell's liabilities, plaintiff could not as matter of right offer other evidence in rebuttal on the same question (Muntz v. Cottage Hill Land Co., 222 Pa. 621; Young v. Edwards,

72 Pa. 257; Jessup v. Loucks, 55 Pa. 350; Gaines v. Com., 50 Pa. 319; Knights of Pythias v. Leadbeter et al., 2 Pa. Superior Ct. 461; 26 R. C. L. page 1047), further than to explain matters offered by the defense: Throckmorton v. Holt, 180 U. S. 552, 563; Asay v. Hay, 89 Pa. 77. As this related to the order of proof it was a matter for the trial court's discretion: Schuck v. West Side Belt R. R. Co., 283 Pa. 152. Evidence, however, was received in rebuttal as to the extent of his assets.

As bearing on the question of solvency, the plaintiff in rebuttal offered the annual capital stock returns made by Mr. Bell as an officer of the various coal companies to the auditor general, giving the values for purposes of state taxation for 1923. These the trial judge admitted but only so far as they might affect Mr. Bell's testimony as to his then net worth. This limitation was right. In general, tax assessments are not proof of value (Girard Trust Co., Trustee, v. Phila., 248 Pa. 179; Hanover Water Co. v. Ashland Iron Co., 84 Pa. 279), except against him who made them: 22 C. J. 178. They were competent as affecting Mr. Bell for he made and swore to them; but John was not an officer in the coal corporations, had no part in making the statements and was a stranger to them. Furthermore, they were made after he received the conveyance. It is fundamental that a grant cannot be nullified by the subsequent declarations of the grantor (see McElfatrick v. Hicks, 21 Pa. 402; Scott v. Heilager et al., 14 Pa. 238; also see Wheeler v. Ahlers, 189 Pa. 138); if it could, the grantee would be at his mercy. Beyond affecting Mr. Bell's testimony, they were not competent. It is suggested for appellant that Mr. Bell's subsequent words and acts were competent on the basis of a conspiracy between him and John. This is the rule only where there has been at least some slight preliminary proof of a conspiracy (Boyer v. Weimer, 204 Pa. 295, 299); here there was none, for there was nothing to indicate that John supposed his father was financially embarrassed, if in fact

he was, when the deed was made. Moreover, there was no suggestion at the trial that the evidence was competent because of a conspiracy. Where evidence is properly excluded at the trial on the ground there urged for its admission, an appellate court will be slow to reverse merely because it might have been admissible on some other theory. The weight of the evidence was for the jury. That for the defendant, if credited, showed Mr. Bell abundantly solvent when he deeded the farm to John; if so, a good title passed regardless of consideration.

Furthermore, if John made a bona fide purchase of the farm from his father, for a fair consideration, without intent to hinder or delay the latter's creditors, he acquired a good title whether his father was solvent or not. The fraudulent intent which will avoid a conveyance for value must be that of the purchaser: Reehling v. Byers, 94 Pa. 316. An insolvent may make an honest sale of his property for a fair consideration. See sections 3, 4 and 5 of the Act of May 21, 1921, P. L. 1045, 1046. If John bought the farm for a fair value in good faith he would not be affected by his father's financial affairs: Penna. Trust Co. v. Schenecker et al., 289 Pa. 277. On this branch of the case the evidence strongly supported the defense. When John graduated from college in 1908 he went to Oklahoma and engaged extensively in the oil and gas business for some nine years under an express agreement that his father would furnish the necessary capital, he would manage the business and they would share the net profits. John bought and leased property, drilled over seven hundred wells, nearly all of which were productive. He bought and sold large blocks of oil and gas property, having transactions running into hundreds of thousands of dollars with the Standard Oil Company, the Sinclair Oil and Gas Company and others. These transactions, amounting in the aggregate to millions of dollars were done in his own name, but financed so far as necessary by his father, who advanced in all for

that purpose about $200,000. According to the testimony, the total net profits of this Oklahoma business, amounting to $2,225,000, were turned over to and retained by Mr. Bell. Contracts in corroboration of the oral evidence as to the extent of this business was properly admitted in evidence. The extent of the net profits was testified to by Mr. Bell and John in round numbers and corroborated by much other evidence. That John received only $200,000 from his father and returned him more than $2,000,000 fortifies the conclusion that the business was profitable.

The proof further tended to show that Mr. Bell bought the farm for John and at his request and by an express agreement conveyed it and its equipment to him (John) in liquidation of his share of the profits of the Oklahoma oil and gas business. If Mr. Bell owed John approximately a million dollars as the latter's share of the oil and gas profits it would be sufficient consideration for the farm although the exact amount was not shown. The trial judge instructed the jury that this could not stand as an adequate consideration unless it was an enforceable legal obligation which John had against his father. While the Oklahoma transactions and the sale of the farm to John find little support in his books or those of his father, they are abundantly corroborated by the declarations of the latter covering a period of years preceding the delivery of the deed.

In prosecuting the oil and gas business in Oklahoma John organized a number of corporations, through which he did business, the books of which, at least in the main, were not produced at the trial. Speaking of this in his charge, the trial judge said, inter alia, "The explanation is made that these books are not available and, if they are not available, you have the right to consider the testimony that was introduced here. You have a right to consider that anyhow because it was accepted without objection, that there was a profit made." Appellant contends this was an instruction that plaintiff admitted

defendant made a profit in Oklahoma. Manifestly the idea the trial judge intended to convey was that the jury had a right to consider oral evidence as to profits which had been accepted without objection; not that plaintiff admitted profits had been made. This clearly appears from other parts of the charge and answers to requests to the effect that the burden was upon John to prove that his father was legally indebted to him for his share of the oil and gas profits to an amount equal to the fair value of the farm and that it was accepted in payment thereof. Taking the charge as a whole it fairly left the question of profits to the jury as a controverted one. There was no claim before verdict that the trial judge had instructed the jury that plaintiff admitted profits had been made in Oklahoma. This indicates that those most interested did not so understand the charge. Moreover, where the charge as a whole is fair, a slight inaccuracy therein will not warrant the granting of a new trial where the verdict is in accord with the evidence. See Cook v. Donaldson et al., 296 Pa. 389. There was some conflict in the evidence on various questions in the case, but in view of the verdict that most favorable to defendant must be accepted. The case turned largely on questions of fact and the verdict, rendered after a fair trial, is supported by the evidence.

The judgment is affirmed.