Wagoner, Trustee, Appellant, *v.* Wallace Turnbull
Corporation et al.

Argued January 8, 1932. Before Frazer, C. J.,
Simpson, Kephart, Schaffer, Maxey and Drew, JJ.

*J. W. McWilliams,* with him *J. I. Weinstein, C. B. Wagoner* and *Chas. S. Wesley,* for appellant.—The transfer was made without fair consideration, and at a time when the company was insolvent: Halpern v. Grabosky, 296 Pa. 108; Hibernia Ins. Co. v. Transportation Co., 13 Fed. 516; Montgomery Web Co. v. Dienelt, 133 Pa. 585; S. G. V. Co. v. S. G. V. Co., 264 Pa. 265; Delphia Knitting Mills Co. v. Richards, 62 Pa. Superior Ct. 9; Penna. Knitting Mills Co. v. Bibb Mfg. Co., 12 Pa. Superior Ct. 346; Peoples Ins. Co. v. Spencer, 53 Pa. 353.

The burden of proof was upon the defendants to show affirmatively that fair consideration was given and that the rights of creditors were not prejudicially affected by the transfer. See Penna. Tr. Co. v. Schenecker, 289 Pa. 277; American Tr. Co. v. Kaufman, 287 Pa. 461; Orr v. Peters, 197 Pa. 606, 613; Wilson v. Silkman, 97 Pa. 509, 512; Radfield v. Dysard, 62 Pa. 62, 66; Woolston's App., 51 Pa. 452; Penna. Knitting Mills Co. v. Bayard, 287 Pa. 216.

Without regard to actual intent, a transfer which hinders and delays the creditors of the transferrors is fraudulent: McKibbin v. Martin, 64 Pa. 352; Keppner v. Burkhart, 5 Pa. 478.

The transfer by the company to the corporation and terminals was not in fact made in good faith but was consummated with the actual intent to hinder, delay' and defraud the creditors of the company: Douglas v. Hustead, 216 Pa. 292; Mattern v. Decker, 59 Pa. Superior Ct. 186; Peoples Ins. Co. v. Spencer, 53 Pa. 353; Powell v. B. & L. Assn., 252 Pa. 587; Wax v. Roydhouse-Arey Co., 59 Pa. Superior Ct. 142; Benjamin v. Holgate,

51 Pa. Superior Ct. 104; Kalbach v. Marine-Galligan, 92 Pa. Superior Ct. 185.

*Ralph B. Evans,* for appellees.—There was no intent to hinder, delay or defraud creditors of the old company.

The new corporation paid a fair consideration for the property: Jarvis v. Bell, 296 Pa. 568; Halpern v. Grobosky, 296 Pa. 108.

There is no substantial identity of interest between the stockholders of the new corporation and the stockholders of the old company.

The creditors of the old company assented to the transaction.

OPINION BY MR. JUSTICE SCHAFFER, March 14, 1932:

It would be of interest to no one except the parties to this litigation for us to set forth all the facts which this somewhat voluminous record discloses. Serving its purpose as a precedent nothing would be added by recounting them. We shall endeavor to outline only those most material matters necessary to delineate the main features of the picture we are to pass judgment upon, leaving out the details.

This is peculiarly a case where the findings and conclusions of the trial judge should have great weight. Testimony of much importance in reaching a decision turns upon the credibility of the witnesses who gave it who were seen and heard by the chancellor, a judge of long service, great experience and sound and impartial judgment.

The proceeding is a bill in equity brought by the trustee in bankruptcy of the Wallace Turnbull Company to set aside the sale of some of its property to the Wallace Turnbull Corporation and Lumber Terminals, Inc., under the allegation that the sale was fraudulent as to the creditors of the Wallace Turnbull Company. The basis of the charge is that the purchasers paid for the property in their common stocks, which was not a fair con-

sideration for the property transferred because the stock had no salable, realizable value. The worth of the property transferred is said to have been $193,149.19 and the consideration paid was $75,000 in stock of the purchasing corporations, the satisfaction of admitted bona fide preferred claims against the selling corporation held by individuals interested in the purchasing ones of $28,000 and $75,000 and the payment of $15,149.19 in cash. As will be seen, these sums aggregate $193,149.19. The fairness of the consideration is attacked only in respect to the common stock which formed a part of it.

The contentions of plaintiff (appellant), the trustee in bankruptcy, thus sum up: (1) The common stock of the defendant corporations at no time possessed any fair, salable value and was not a fair equivalent for the tangible, salable assets of the vendor company conveyed to them having a realizable cash value of at least $75,000. The conveyance so far as creditors were concerned was, therefore, in violation of the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, section 4, which requires "a fair consideration." (2) The vendor company was insolvent at the time the transfers were made within the definition of insolvency laid down by the act in section 2: "A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." The court found that the consideration was fair and that the purchasers had no knowledge that the company was not solvent. It determined that there was no intention in any of the parties to the transactions to defraud creditors of the selling company.

Prior to October 29, 1926, the Wallace Turnbull Company (hereinafter called Company) was engaged in the lumber business. J. Wallace Turnbull was the only stockholder. Edward F. Henson and Clayton W. Nichols, two of the defendants, were the owners of a wharf property which they had leased to the Company,

which owed them rent amounting to $28,000. This was found by the trial judge to be a preferred claim. Maurice C. Burton, another defendant, was a creditor of the Company with a preferred and secured claim of $75,000.

On the date named, October 29, 1926, an agreement was entered into between the Company, the Wallace Turnbull Corporation (herinafter called Corporation) and Turnbull, Burton, Henson and Nichols, which provided that the Corporation was to acquire and continue the business of the Company taking over its entire stock of old and new lumber and certain other assets, that a new corporation was to be organized to be known as Lumber Terminals, Inc., which was to acquire the equipment, machinery, furniture and fixtures of the old Company; that Henson and Nichols were to subscribe to the first preferred stock in both new corporations, each contributing $75,000; that the indebtedness of the Company to Burton in the amount of $75,000 was to be paid off and that he was to invest this sum in the second preferred stock in the new corporations of the total par value of $75,000; and that out of the money received by it the Company was to invest $75,000 in the common stock of the two new corporations, which were to pay the Company for the property it was to transfer at a fair valuation to be determined by Turnbull and Burton, who were to be respectively the president and treasurer of the two new concerns. The agreement also provided that the common stock rights to assets and dividends should be postponed to the two issues of preferred stock. There were certain options given relating to the purchase of stock by Turnbull, Henson, Nichols and Burton in the event of death or disagreements and it was provided that the stock could not be sold or transferred except subject to these limitations which were to be shown by endorsement on the face of the shares. It was stipulated that the agreement should not become operative unless Burton should be satisfied that the valuations placed on the property to be acquired by the new corpo-

rations would be sufficient to pay his and Henson and Nichols' indebtedness and the Company's subscription to the common stock. The debts of the Company were not to be assumed by the transferee corporations. Notice was not to be given under the Bulk Sales Act. Turnbull and the Company covenanted to indemnify the two new corporations against any claims of the Company's creditors under that statute, and further agreed to deposit with them the Company's holdings of capital stock to be held until the ninety days prescribed by the Bulk Sales Act should have expired. The terms of the agreement were carried out and the total valuation of the property to be transferred by the old Company was, as before stated, fixed at $193,149.19. The new lumber was turned over at the current quoted price and the old lumber at a tentative value, which was subject to adjustment, depending upon what was realized from its sale. The old Company received $75,000 in common stock of the new corporations, the satisfaction of its indebtedness to Henson and Nichols, amounting to $28,000, of its indebtedness to Burton, amounting to $75,000, and in addition there was paid to it $15,149.19 in cash. The new corporations proceeded to carry on the business on the same premises where it had been conducted by the old Company.

In the negotiations which led up to the agreement, Turnbull had produced financial statements which indicated that the old Company had made money and was in sound financial condition. It had a capital of but $25,000, but his latest statement certified by the Company's accountant showed a net worth of $97,025.22. He was of the opinion that its net worth was in excess of $100,000. After the transfer, the old Company was left with assets on its books, amounting to $362,696.44, and liabilities amounting to $315,722.61. Subsequently, it developed that the books did not reflect the correct financial condition of the old Company, so that in reality, instead of being solvent, as its books indicated, it was

insolvent. The chancellor found that the appellees had no idea of this until sometime after the transfer had been consummated.

Following the transfer, Turnbull proceeded to liquidate the indebtedness of the old Company. Some of it was paid in full. Other creditors were given notes of the old Company with his personal endorsement and stock in the new corporations as security. The transfer was effected October 30, 1926, and the old Company was adjudicated bankrupt December 14, 1927. It was found to owe about $90,000.

The position of the appellant, trustee in bankruptcy of the old Company, is that its property when transferred was of the value of $193,149.19, subject to the preferred debts amounting to $103,000, and that it received in payment therefor stock not worth that sum, indeed not possessing any value. Both of these propositions are somewhat hypothetical and speculative. It certainly is open to grave question whether the stock of lumber could have been sold at the time of the transfer for anything like the full figure named and the chancellor so concluded; and it is equally true that it could not have been determined at that time that the stock which subsequently turned out to be worthless did not have a value which approximated the real value of the materials which were given in exchange for it. If we were dealing with a case in which there was bad faith shown by the parties to the transaction, then it might be that it could be held fraudulent, but the chancellor and the court in banc determined that there was no bad faith on the part of those who carried it on. Henson and Nichols each put $75,000 in cash in the new Company, and Burton a like amount by releasing his preferred claim, so that these three individuals contributed $225,000 to the new Company based on their faith in its ability to operate successfully. That they were mistaken in their optimism as to the future success of the enterprise could not put the badge of fraud on what they did in apparent

good faith. A purchaser who in good faith pays a fair consideration, acquires a good title regardless of the seller's insolvency: Jarvis v. Bell, 296 Pa. 568.

The chancellor found that there was every logical reason for expecting that the new concerns would have profitable careers. It would not strain the bounds of credulity to conclude that the creditors of the old Company who received stock in the new corporations would have been glad to have had its assets put into new concerns with $225,000 of additional capital added to the business. It is set forth in the findings of the chancellor that there was no testimony on the subject of the value of the stock after the transfer was made, except that its book value was par, that market value was not shown; in its absence, the best evidence is the book value: Jarvis v. Bell, supra. The chancellor concluded, and we see nothing to impeach his finding, that the new Company was soundly capitalized, that there was no watering of its stock, that it was manned and officered by experienced lumbermen. He concluded that the stock was worth its face value on October 29, 1926. That the stock may not have been immediately salable when the Company received it could not prevent its being fair consideration, if it was then worth its face value. In many close trading corporations their capital stock is not salable. Having heard the witnesses, the chancellor refused to credit testimony tending to show that Burton had promised to lend additional money if it were needed to pay the debts of the old Company and we are bound by his finding in this respect. Categorically, he found: "The Wallace Turnbull Corporation and the Lumber Terminals, Inc., paid a fair consideration for the property which they respectively purchased from the Wallace Turnbull Company. The transaction between the Wallace Turnbull Company and the Wallace Turnbull Corporation and Lumber Terminals, Inc., was entered into in good faith and not for the purpose or with the intent of securing payment of the claims of Henson and

Burton or of defrauding, hindering or delaying further creditors of Wallace Turnbull Company." Furthermore, he found that all parties concerned thought the old Turnbull Company was not only solvent, but prosperous. He summed up his own conclusion in this respect with the statement: "We think the company was sound. The plaintiff so alleges in the fourth paragraph of the bill." Nothing brought to our attention has shaken the findings of the chancellor to which we have referred, and, in view of them, by looking backward over the situation which developed after the new business failed of success, we could not conclude that the transaction was fraudulent.

The test would not be what the stock was worth after the new corporations ceased to profitably function, but what was the stock worth at the time the transfer was made. The stock in the new corporations was issued for money actually subscribed (the releasing of the preferred claims against the old Company was in effect the payment of money) and for property of the old Company. There was no stock not issued for value. In the treasury of the old Company after the transaction was completed was the stock of the new companies which had been issued for the property of the old. At that time it could not be possible that it did not have value; that it thereafter depreciated could not avoid the transaction which the chancellor characterized as "entirely honest and sensible."

The decree of the court below is affirmed at appellant's cost.